UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                          :

DAMIAN BROWN,                           :
                                          :

            Plaintiff,          :  11 Civ. 7797 (JSR) (GWG)
                                        :  05 Cr. 538 (JSR)

   -v.-                           :
                                        :  <u>REPORT</u>
UNITED STATES OF AMERICA,       :  <u>AND RECOMMENDATION</u>
                                        :

           Defendant.       :
                                        :
-------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

     Damian Brown, currently an inmate at the Allenwood Federal Correctional Institution in

White Deer, Pennsylvania, has brought this <u>pro se</u> petition for a writ of habeas corpus under 28

U.S.C. § 2255 challenging his judgment of conviction after trial.  For the reasons set forth below,

his petition should be denied.

I.     <u>BACKGROUND</u>

     A.     <u>Indictment and Trial</u>

     Brown was charged in a superseding indictment with the following offenses: (1)

conspiracy to distribute and to possess with intent to distribute 100 kilograms or more of

marijuana in violation of 21 U.S.C. §§ 812, 841(a)(1), (b)(1)(B); (2) using and carrying a firearm

in relation to the drug conspiracy charged in count one that resulted in the murder of Keino

Simpson in violation of 18 U.S.C. §§ 924(j)(1), (2); (3) using and carrying a firearm in relation

to, and in furtherance of, the drug conspiracy charged in count one in violation of 18 U.S.C.

§§ 924(c)(1)(A)(iii), (2); and (4) possessing a firearm as an illegal alien in violation of 18 U.S.C.

§§ 922(g)(5)(A), (2).  <u>See</u> Indictment, <u>United States v. Brown</u>, 05 Cr. 538 (JSR) (S.D.N.Y. filed

Nov. 15, 2006) (Docket # 40) ("Indictment").  Allan Paul Haber was appointed as Brown's

counsel, <u>see</u> Appointment of Attorney, <u>United States v. Brown</u>, 05 Cr. 538 (JSR) (S.D.N.Y. filed

July 17, 2005) (Docket # 14), and represented him at trial and at sentencing.[1]

Judge Jed S. Rakoff presided over Brown's trial, which took place in June 2008.  <u>See</u>

Transcripts of Proceedings, <u>United States v. Brown</u>, 05 Cr. 538 (JSR) (S.D.N.Y. filed July 11,

2008) (Docket ## 98–102) ("Tr.").  Over the course of the 11-day trial, the Government

presented 24 witnesses.  The evidence at trial is summarized to the extent relevant to this

petition.

The Government offered evidence that Brown worked for co-defendant Shawn Peterkin

selling and distributing marijuana.  Dwight Mundle, a cooperating witness, testified that from

2003 to 2005 he purchased large quantities of marijuana from Peterkin.  (Mundle: Tr. 310).  On

one occasion in 2004, Brown delivered a quarter pound of marijuana to Mundle on Peterkin's

behalf.  (Mundle: Tr. 321–22).  Another cooperating witness, Tyson Barrett, testified that he also

purchased marijuana from Peterkin.  (Barrett: Tr. 692–93).  In November or December 2004,

Brown collected money Barrett owed Peterkin from the sale of marijuana.  (Barrett: Tr. 700–01).

Simpson, the victim in this case, also worked for Peterkin in the marijuana business.

Omar Ken, an associate of Simpson, testified that Simpson's role was to pick up marijuana

packages at commercial mailbox stores for Peterkin.  (Ken: Tr. 832–36).  Simpson and others

then sold the marijuana and remitted part of the proceeds to Peterkin.  (Ken: Tr. 823–26).

During a pick up in 2005, Simpson allegedly lost a package of Peterkin's marijuana.  (Ken: Tr.

---

[1] Stephanie M. Carvlin was also appointed by the court to represent Brown.  <u>See</u>
Appointment of Attorney, <u>United States v. Brown</u>, 05 Cr. 538 (JSR) (S.D.N.Y. filed July 17,
2005) (Docket # 15).

2

836).  Peterkin demanded that Simpson pay for the package, but Simpson refused.  (Ken: Tr. 837).  Following the dispute, Simpson enlisted Ken to rob Peterkin in his home.  (Id.).  They forcibly entered Peterkin's home wearing ski masks and carrying guns.  (Ken: Tr. 838–39).  Ken tied up Peterkin and demanded that Peterkin's wife locate money in the house.  (Ken: Tr. 841).  Ken hit her several times with his gun and threatened to burn her with an iron.  (Ken: Tr. 841–42).  Ken also placed duct tape over Peterkin's 11-year-old daughter's mouth.  (Ken: Tr. 843).  Simpson and Ken seized 25 pounds of marijuana and cash from Peterkin's house.  (Ken: Tr. 842).

Following the robbery, Peterkin called Brown and co-defendant Franz Golding, who came over to Peterkin's house.  Peterkin informed them about the robbery.  (Murray: Tr. 1046; Peterkin: 1768).  Ken testified that the next night, he and Simpson were in a car parked in front of the National Black Theater in Harlem.  (Ken: Tr. 846–47).  A silver Nissan Maxima containing Peterkin, Brown, Golding, and a fourth unidentified individual pulled alongside Simpson and Ken.  (Ken: Tr. 847–48).  Peterkin attempted to fire a handgun at Simpson and Ken, but the gun did not fire.  (Ken: Tr. 848).  Golding then fired a machine gun at Simpson's door.  (Ken: Tr. 848–49).  Simpson began firing back at Peterkin's car.  (Ken: Tr. 849).  No one was wounded in the altercation.  (Ken: Tr. 850).

Approximately a week later, Simpson and Ken met with Peterkin in an attempt to convince him that they were not the robbers.  (Ken: Tr. 854).  Ken testified that Simpson became angry during the conversation, and fired shots into the air.  (Ken: Tr. 556–57).  Following the confrontation, Brown called Simpson and Ken, and demanded that they return the property taken in the robbery.  (Ken: Tr. 857–58).  Brown stated that "[i]t don't [sic] make no [sic] sense [for us] to be fighting or warring."  (Ken: Tr. 858).  Golding then came onto the phone and stated

3

"[w]hen I catch your fat ass, I'm going to bullet you up," which meant that he was going to shoot Ken.  (Ken: Tr. 858–59).

A week later, Ken went looking for Peterkin and his associates to shoot them in response to the threat Golding made over the phone.  (Ken: Tr. 859).  Upon finding Peterkin, Golding, and co-defendant Dwayne Palmer on East 223rd Street in the Bronx, Ken fired approximately seven shots from his nine-millimeter handgun.  (Ken: Tr. 859–60).  Palmer attempted to fire back, but Ken believed that his firearm never went off.  (Ken: Tr. 861).  No one was harmed in this incident.  (Ken: Tr. 860).

In the early morning on April 16, 2005, Simpson, Ken, and a third individual, David Reeves, were in three separate cars on White Plains Roads in the Bronx.  (Ken: Tr. 863–65).  A silver Nissan Maxima containing Peterkin, Brown, Golding, and Palmer pulled up.  (Ken: Tr. 866).  Peterkin drove the car, and Brown was in the passenger's seat.  (Id.).  Brown and Palmer began firing handguns and Golding began firing an AK-47 assault rifle at the cars containing Simpson, Ken, and Reeves.  (Ken: Tr. 866–68).  Simpson, Ken, and Reeves fled in their cars resulting in a high-speed chase.  (Ken: Tr. 868–70).  The Maxima caught up with Simpson's car at the corner of Gun Hill Road and Gates Road.  (Mitchell: Tr. 51–53).  A witness who lives on Gun Hill Road testified that she heard a car crash followed by gun fire.  (Mitchell: Tr. 51–55).

Upon receiving a phone call that multiple shots had been fired, Officer Daniel Malone of the New York City Police Department ("NYPD") was the first to arrive at the scene on Gun Hill Road.  (Malone: Tr. 114–16).  He found Simpson's body in the street.  (Malone: Tr. 114–15).  Officer Malone called an ambulance.  (Malone: Tr. 115–16).  Medical personnel attempted to resuscitate Simpson, but he died from two gunshot wounds.  (Smiddy: Tr. 170–73).  NYPD investigators found approximately 17 bullet holes in Simpson's car.  (Wekar: Tr. 1277–78).  At

4

least three guns were fired at the murder scene: an AK-47, a .40 caliber Glock handgun, and a nine-millimeter handgun.  (Fontanez: Tr. 1530–40).  On April 17, 2005, Peterkin, Golding, and Palmer were arrested in a motel in Fort Lee, New Jersey.  (Rodriguez: Tr. 217–30).  The police found a .40 caliber Glock semi-automatic handgun in Palmer's room (Rodriguez: Tr. 221–22), a nine-millimeter semi-automatic handgun in Peterkin's room (Rodriguez: Tr. 227–29), and a .40 caliber Fratelli Tanfolio semi-automatic handgun in Golding's room (Rodriguez: Tr. 223–24).  An expert testified that ballistics materials recovered from the crime scene were "more likely than not" fired from the Glock found in Palmer's motel room.  (Fontanez: Tr. 1531–32).

Following his arrest, Brown waived his <u>Miranda</u> rights and submitted to an interview with NYPD Detective John Murray.  (Murray: Tr. 1044).  Brown agreed to make a written statement during this interview, portions of which Detective Murray read aloud at trial.  (Murray: Tr. 1045–49).  Brown's statement recounted Simpson and Ken robbing Peterkin.  (Murray: Tr. 1046).  The statement also detailed the conflict in front of the National Black Theater.  (Murray: Tr. 1047).  With regard to the killing of Simpson, Brown admitted he was in a Maxima with three other individuals.  (Murray: Tr. 1048).  Brown claimed that Simpson, Ken, and Reeves began firing first, so Brown and the others in the Maxima shot back.  (<u>Id.</u>).  Brown stated that "[w]e all had guns, and we [were] shooting . . . ."  (<u>Id.</u>).  Brown and the three others chased down one of the cars after it "stopped and spun around."  (Murray: Tr. 1049).  They shot at the car in "a barrage of shooting."  (<u>Id.</u>).  One of the individuals in the Maxima got out of the car, and shot "six or seven times with the big gun."  (<u>Id.</u>).  Brown recalled that "[a]nother guy had a small gun, black. . . .  I had a small one, gray and black."  (<u>Id.</u>).  Following the shooting, Brown disposed of the firearm "by the Bronx River."  (<u>Id.</u>).

While in federal detention, Brown and cooperating witness Ken spoke to each other.

5

(Ken: Tr. 872).  Brown admitted to Ken that he was carrying a Glock during the shooting, but

that "he wasn't trying to hurt nobody because he was firing in the air."  (Ken: Tr. 872–73).

Brown also encountered another cooperating witness, Mundle, in federal detention.  (Mundle:

Tr. 385–86).  Mundle testified that Brown told him, "You're a loser, tell the prosecutor they

going to lose.  I'll see you in Jamaica, welcome to West Kingston."  (Mundle: Tr. 385).  Mundle

understood Brown's statement to mean "[b]asically that when [Brown] sees me he's going to

hurt me," as West Kingston is known to be a dangerous area in Jamaica.  (Mundle: Tr. 386).

At trial, Brown called several witnesses in his defense.  He called Adron Lewis.  (See

Lewis: Tr. 1637–48).  Lewis testified that in the early morning of April 16, 2005, Brown asked

him for a ride home, but Lewis refused because he had to go to work.  (Lewis: Tr. 1642–44).

Additionally, Anika Thomas, the mother of Brown's child, testified that Brown was a

professional football player in Jamaica (Thomas: Tr. 1651–52), and that in the United States

Brown worked as a barber and club promoter (Thomas: Tr. 1653–54).  With respect to Brown's

academic abilities, she stated that he "could not read well in school.  He wasn't good at

academics.  He couldn't do schoolwork. . . .  He was very slow."  (Thomas: Tr. 1651).

B.     The Jury Verdict and Sentencing

On June 23, 2008, the jury returned a verdict finding Brown and his co-defendants guilty

on all counts in the indictment.  (Tr. 2067–72).[2]  Prior to Brown's sentencing, the United States

Probation Office prepared a Presentence Investigation Report ("PSIR").  See Presentence

Investigation Report, dated Sept. 15, 2008.  The PSIR calculated Brown's sentencing range

---

[2]  The jury found Brown guilty of conspiracy to distribute between 50 and 100 kilograms of marijuana (see Tr. 2068), rather than conspiracy to distribute 100 kilograms or more of marijuana, as charged in the indictment, see Indictment ¶ 2.

6

under the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.").  According to

the PSIR, Brown had a base offense level of 43 pursuant to Guidelines § 2A1.1(a), as the

evidence at trial proved that his conduct constituted first-degree murder.  Id. ¶¶ 32–36.  Brown's

offense level was increased by two points for obstruction of justice under Guidelines § 3C1.1

because evidence showed that he threatened a cooperating witness prior to testifying at trial.  Id.

¶¶ 30, 40.  The report also noted that on July 13, 2007, corrections officers found "an 11-inch

sharpened metal object under [Brown's] assigned locker."  PSIR ¶ 10.  The PSIR found that

Brown was in Criminal History Category I.  Id. ¶¶ 59–62.  The PSIR concluded that Brown's

sentencing range was life imprisonment, id. ¶ 89, and recommended a sentence of life

imprisonment, id. at 21.[3]

Brown's counsel submitted a letter to the court that provided information relevant to

sentencing and argued for a sentence of 20 years.  See Def. Sent. Mem. at 13.  First, it argued

that Brown should be sentenced for second-degree murder pursuant to Guidelines § 2A1.2 rather

than first-degree murder pursuant to Guidelines § 2A1.1.  Id. at 3–5.  The letter explained that

"[a]s the evidence at trial demonstrated, Mr. Brown did not plan to kill Keino Simpson. . . .

[T]here is no basis for concluding that Mr. Brown's participation in the events of April 16, 2005,

---

[3]  The Probation Report also asserted that pursuant to 18 U.S.C. § 924(c)(1)(A)(iii) there was a 10-year mandatory minimum sentence of imprisonment that would run consecutively with any other term of imprisonment for count three in the indictment: discharge of a firearm in furtherance of a drug conspiracy.  See PSIR ¶ 88.  Brown argued that under United States v. Parkes, 497 F.3d 220, 234 (2d Cir. 2007), cert. denied, 522 U.S. 1333 (2008), a conviction under § 924(c) was a lesser-included offense to the murder charge under § 924(j), and that therefore the 10-year mandatory minimum sentence was inapplicable.  See Letter from Allan P. Haber, United States v. Brown, 05 Cr. 538 (JSR) (S.D.N.Y. filed Sept. 15, 2008) (Docket # 106) ("Def. Sent. Mem."), at 5–6.  At sentencing, the court concurred with Brown's argument and did not impose a sentence on the discharge of a firearm in furtherance of a drug conspiracy, as it was a lesser-included offense to the murder conviction.  See Sentencing Transcript, United States v. Brown, 05 Cr. 538 (JSR) (S.D.N.Y. filed Dec. 8, 2008) (Docket # 125) ("Sent. Tr."), 2–3.

was premeditated.  Rather, this is a classic example of someone being in the wrong place and at the wrong time . . . ."  Id. at 4–5.  In response, the Government asserted that "the evidence at trial conclusively established . . . Brown's intentional and knowing role in the murder of Keino Simpson."  Letter from Michael Q. English & Jessica A. Masella, Assistant United States Attorneys, United States v. Brown, 05 Cr. 538 (JSR) (S.D.N.Y. filed Sept. 18, 2008) (Docket # 110) ("Gov't Sent. Mem."), at 2.  In particular, the Government cited Brown's statements to police as showing that he was aware of the prior violence among Peterkin, Simpson, and Ken; that he intentionally went with the co-defendants looking for Simpson and Ken on April 16, 2005; and that he fired his gun during the incident.  Id.

        The letter submitted on Brown's behalf also highlighted his mental impairments.  Def. Sent. Mem. at 7–8.  At the request of Brown's counsel, Forensic Social Work Consultant Cermeta Albarus-Lindo prepared a report that detailed Brown's family background, education, employment, and migration to the United States.  See Pre-Sentencing Report, dated Aug. 11, 2008 (annexed as Ex. 3 to Def. Sent. Mem.) ("Albarus-Lindo Report").  The report indicated that the charged offenses were out of character, as Brown's "history shows that he is by nature a sociable, decent, and peaceful person."  Id. at 18.  The report suggested that others exploited Brown due to his limited intellectual functioning.  See id. at 17–18.  Wilfred G. van Gorp, PhD., ABPP-CN, Professor of Clinical Psychology, and Director of Neuropsychology at Columbia Presbyterian Medical Center, was retained to evaluate Brown's cognitive functioning.  Def. Sent. Mem at 7.  Following extensive testing, Dr. van Gorp found that Brown had "a lifelong history of Borderline intellectual functioning, likely in the range of Mild Mental Retardation . . . ."  Neuropsychological Evaluation, dated Mar. 2006 (annexed as Ex. 4 to Def. Sent. Mem.) ("Van Gorp Report"), at 6.  Brown had a "Full Scale IQ of 70," id. at 3, and "[h]is verbal expression is

extremely limited," id. at 6.  Dr. van Gorp concluded that Brown is "an individual who is unlikely to have the skills necessary to care for himself and live independently" and that "[h]e exhibits an insufficient understanding of his situation, and does not appear to understand fully why he is in jail or what may become of him if he is found guilty."  Id.  The Government arranged for Cheryl Paradis, Psy. D., to evaluate Brown's cognitive and intellectual functioning. See Forensic Psychological Evaluation, dated Dec. 15, 2007 (annexed as Ex. 5 to Def. Sent. Mem.) ("Paradis Report"), at 1.  Dr. Paradis also concluded that Brown has a Full Scale IQ of 70, that he has "reduced mental capacity due to intellectual deficits and limited education," and that "[h]e also demonstrates significant deficits in everyday, adaptive functioning."  Id. at 6.

Brown's counsel submitted to the court a number of letters from Brown's friends and family suggesting that Brown had reduced cognitive abilities.  For example, Nicola Brown, Brown's youngest sister, stated that Brown "was very poor in learning," he had a very low IQ, he had difficulty reading, and he was placed in special classes and trade classes due to being a poor student.  See Letter from Nicola Brown, dated Sept. 10, 2008 (annexed as part of Ex. 6 to Def. Sent. Mem.) ("Nicola Brown Letter").

At the sentencing hearing, Brown's counsel argued that "it would be more appropriate to apply second degree murder versus first degree murder" when computing Brown's sentence. (Sent. Tr. 3).  The court commented that Brown "played a material role" in a "blatant murder." (Sent. Tr. 4).  The court concluded "[t]here was an argument but I was not persuaded by it so . . . I will adhere to the presentence report in that respect."  (Id.).  Next, the court expressed "concern[] about the seeming threat [Brown made against] one of the government's cooperating witnesses" (id.) — referring to Brown's statement to Mundle while in prison,  see Gov't Sent. Mem. at 2.  Brown's counsel argued that

9

it was unclear about exactly what was said and we know that sometimes a case can hinge on a single word . . . .  But, I believe that if [Brown] did say anything . . . he was just caught up in the moment and [his statement] had nothing to do with real threats or anything that he would ever follow up on given his nature, given his history.  It is just not consistent at all.

(Sent. Tr. 8).  The court, however, credited Mundle's testimony about the threat, stating that it "occurred in very much the way it was testified to at trial . . . ."  (Sent. Tr. 14).

At the sentencing hearing, Brown's counsel also highlighted Brown's "history and characteristics," including that he was "particularly vulnerable to do things that he otherwise would not have done" due to "being challenged intellectually."  (Sent. Tr. 5–6).  Counsel noted the evaluations of Dr. van Gorp and Dr. Paradis, both of which concluded "that [Brown] was easily influenced, [and] that he was incapable of living on his own."  (Sent. Tr. 6).

In rendering a sentence, the court stated that it had "incorporat[ed] by reference all that [was] said in the sentencing of Mr. Peterkin."  (Sent. Tr. 13).[4]   In sentencing Brown, the court stated that it "very seriously considered the possibility of . . . a 30 year sentence which, in the Court's view, is the lowest that the Court could impose consistent with the provisions of Section 3553(a) and the need for deterrence, just punishment, etc. as reflected in aspects of that statute." (Sent. Tr. 13).  The court noted that "Mr. Brown was not a ring leader of the conspiracy," and as a result, "there is no way [the court] could sentence Mr. Brown to more than the 45 years"

---

[4]  At Peterkin's sentencing, the court commented that it had "thought a great deal about all four sentences in this case."  See Sentencing Transcript, United States v. Brown, 05 Cr. 538 (JSR) (S.D.N.Y. filed Nov. 25, 2008) (Docket # 123) ("Peterkin Sent. Tr."), 10.  The court found that Peterkin "was the ring leader of the marijuana conspiracy, and he played a material role in organizing the murder."  (Id.).  Peterkin "was a person who . . . set about to murder another human being . . . ."  (Peterkin Sent. Tr. 22).  Pointing to the "sanctity of human life [and] the need for the greater protection of the public generally to always send a message that murder is not permitted" (Peterkin Sent. Tr. 22–23), the court concluded that "there is no question that he's got to receive . . . a very long sentence" (Peterkin Sent. Tr. 19).  The court sentenced Peterkin to 45 years imprisonment.  (Peterkin Sent. Tr. 26).

Peterkin received. (Sent. Tr. 4). However, the court increased the sentence above 30 years "for several reasons but the most important of which being his threatening of the government's cooperating witness . . . indicates to the Court that there is a need for additional deterrence." (Sent. Tr. 13–14). The court sentenced Brown principally to 390 months — that is, 32-1/2 years — imprisonment. (Sent. Tr. 14).

    C.    Appeals

    Brown appealed his conviction and sentence to the Second Circuit. See Notice of Appeal, United States v. Brown, 05 Cr. 538 (JSR) (S.D.N.Y. filed Oct. 1, 2008) (Docket # 117). On appeal, Brown's counsel argued (1) that the District Court should have calculated his base offense level under the Guidelines for second-degree murder rather than first-degree murder; (2) that the District Court erred in admitting evidence of a prior bad act as proof of Brown's participation in the drug conspiracy; and (3) that the District Court erred in refusing to charge the jury on self-defense. See Brief on Behalf of Defendant-Appellant Damian Brown, United States v. Brown, 08-4882-Cr. (2d Cir. filed Feb. 8, 2010) ("Def. App. Br."). With respect to the sentencing for first-degree murder, Brown's counsel argued that the evidence at trial failed to establish that Brown's participation in the murder was premeditated. Id. at 22. Specifically, he argued that "Mr. Brown fortuitously ended up as a passenger in the vehicle that Mr. Peterkin was driving when Mr. Simpson was killed," as "Mr. Brown had not planned to be with Peterkin that night" but "his ride could not take him home." Id. (emphasis in original).

    On April 23, 2010, the Second Circuit rejected Brown's claims. See United States v. Brown, 374 F. App'x 208, 210–11 (2d Cir. 2010). On October 20, 2010, Brown filed a petition for a writ of certiorari to the Supreme Court of the United States, which was denied on November 15, 2010. Brown v. United States, 131 S. Ct. 619 (2010).

11

D.     Instant Motion

On October 31, 2011, Brown filed this motion to vacate, set aside, or correct his sentence

pursuant to 28 U.S.C. § 2255.  See Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or

Correct Sentence by a Person in Federal Custody, filed Oct. 31, 2011 (Docket # 1);

Memorandum of Law in Support of Movant's Pro Se Motion to Vacate, Set Aside or Correct a

Federal Sentence or Conviction Pursuant to 28 U.S.C. § 2255, filed Oct. 31, 2011 (Docket #1)

("Pet'r Mem.").  The Government filed opposition papers on April 6, 2012.  See Government's

Memorandum of Law in Opposition to Defendant Damian Brown's Motion to Vacate, Set Aside,

or Correct his Sentence Under 28 U.S.C. § 2255, filed Apr. 6, 2012 (Docket # 7) ("Gov't

Mem.").  On May 25, 2012, Brown filed a reply to the Government's opposition.  See Movant's

Pro Se Traverse in Reply to Government's Response in Opposition to Motion to Vacate Pursuant

to 28 U.S.C. § 2255, filed May 25, 2012 (Docket # 9) ("Pet'r Reply").

II.     APPLICABLE LAW

A.     Law Governing Review of Section 2255 Petition

Section 2255(a) of Title 28 of the United States Code provides that:

[a] prisoner in custody under sentence of a court established by Act of Congress
claiming the right to be released upon the ground that the sentence was imposed
in violation of the Constitution or laws of the United States, or that the court was
without jurisdiction to impose such sentence, or that the sentence was in excess of
the maximum authorized by law, or is otherwise subject to collateral attack, may
move the court which imposed the sentence to vacate, set aside or correct the
sentence.

Relief under this statute is available "only for a constitutional error, a lack of jurisdiction in the

sentencing court, or an error of law or fact that constitutes a fundamental defect which inherently

results in [a] complete miscarriage of justice."  Graziano v. United States, 83 F.3d 587, 590 (2d

Cir. 1996) (citation and internal quotation marks omitted).  "Because collateral challenges are in

12

tension with society's strong interest in the finality of criminal convictions, the courts have established rules that make it more difficult for a defendant to upset a conviction by collateral, as opposed to direct, attack." Yick Man Mui v. United States, 614 F.3d 50, 53 (2d Cir. 2010) (citation and internal quotation marks omitted).

In considering a § 2255 petition, "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." 28 U.S.C. § 2255(b). On the other hand, if it "plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the judge must dismiss the motion." Puglisi v. United States, 586 F.3d 209, 213 (2d Cir. 2009) (citation and internal quotation marks omitted). A testimonial hearing need not take place if it would not succeed in providing additional material facts. See generally Fermin v. United States, 859 F. Supp. 2d 590, 601–02 (S.D.N.Y. 2012).

B.    Law Governing Procedural Default

If a claim contained in a habeas petition was not asserted on direct review, the claim will be considered procedurally defaulted — and thus ineligible for review in a subsequent proceeding under § 2255 — unless the petitioner "can first demonstrate either 'cause' [for the default] and actual 'prejudice' or that he is 'actually innocent.'" Bousley v. United States, 523 U.S. 614, 622 (1998) (citations omitted); accord United States v. Frady, 456 U.S. 152, 167–68 (1982); Zhang v. United States, 506 F.3d 162, 166 (2d Cir. 2007) ("[T]he procedural default bar may be overcome only where the petitioner establishes either (1) 'cause' for the failure to bring a direct appeal and 'actual prejudice' from the alleged violations; or (2) 'actual innocence.'") (citation omitted). To satisfy the "cause" requirement, the petitioner must show circumstances

13

"'<u>external</u> to the petitioner, something that cannot be fairly attributed to him.'"  <u>Marone v.</u>

<u>United States</u>, 10 F.3d 65, 67 (2d Cir. 1993) (per curiam) (quoting <u>Coleman v. Thompson</u>, 501

U.S. 722, 753 (1991) (emphasis in original)).  "Objective factors that constitute cause include

interference by officials that makes compliance with the State's procedural rule impracticable,

and a showing that the factual or legal basis for a claim was not reasonably available to counsel."

<u>McCleskey v. Zant</u>, 499 U.S. 467, 493–94 (1991) (citation and internal quotation marks

omitted).  Attorney error or ignorance does not amount to "cause" for a procedural default unless

the error rises to the level of constitutional ineffectiveness.  <u>Coleman</u>, 501 U.S. at 752–55;

<u>accord</u> <u>United States v. Pipitone</u>, 67 F.3d 34, 38–39 (2d Cir. 1995) (defense counsel's ignorance

of existing legal authority does not amount to "cause" for failure to appeal a sentence).  The

resulting "prejudice" must create an "<u>actual</u> and substantial disadvantage, infecting [the

petitioner's] entire trial with error of constitutional dimensions."  <u>Frady</u>, 456 U.S. at 170

(emphasis in original).  Finally, "[t]o establish actual innocence, [the] petitioner must

demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror

would have convicted him."  <u>Bousley</u>, 523 U.S. at 623 (citations and internal quotation marks

omitted).

     An exception to the procedural default rule exists for claims of ineffective assistance of

counsel.  In <u>Massaro v. United States</u>, 538 U.S. 500, 504 (2003), the Supreme Court held that

"an ineffective-assistance-of-counsel claim may be brought in a collateral proceeding under

§ 2255, whether or not the petitioner could have raised the claim on direct appeal."

     C.    <u>Law Governing Ineffective Assistance of Counsel Claims</u>

     "In order to prove ineffective assistance, [a petitioner] must show (1) 'that counsel's

representation fell below an objective standard of reasonableness'; and (2) 'that there is a

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Pham v. United States, 317 F.3d 178, 182 (2d Cir. 2003) (quoting Strickland v. Washington, 466 U.S. 668, 688, 694 (1984)); accord United States v. Brown, 623 F.3d 104, 112 (2d Cir. 2010); see also Massaro, 538 U.S. at 505 ("[A] defendant claiming ineffective counsel must show that counsel's actions were not supported by a reasonable strategy and that the error was prejudicial.").

In evaluating the first prong — whether counsel's performance fell below an objective standard of reasonableness — "'[j]udicial scrutiny . . . must be highly deferential,'" and the petitioner must overcome the "'presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'" Bell v. Cone, 535 U.S. 685, 698 (2002) (quoting Strickland, 466 U.S. at 689); see also Dunham v. Travis, 313 F.3d 724, 730 (2d Cir. 2002) (according counsel a presumption of competence). To satisfy the prejudice requirement, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694; accord Lynn v. Bliden, 443 F.3d 238, 247–48 (2d Cir. 2006), cert. denied, 549 U.S. 1257 (2007). The Second Circuit generally "requires some objective evidence other than defendant's assertions to establish prejudice." Pham, 317 F.3d at 182 (citing United States v. Gordon, 156 F.3d 376, 380–81 (2d Cir. 1998) (per curiam)).

The Strickland test applies to claims that appellate counsel was ineffective. See Smith v. Robbins, 528 U.S. 259, 285 (2000). That is, the petitioner must prove "both that (1) appellate counsel acted objectively unreasonable in failing to raise a particular issue on appeal, and (2) absent counsel's deficient performance, there was a reasonable probability that defendant's

appeal would have been successful . . . ." Larrea v. Bennett, 2002 WL 1173564, at *18

(S.D.N.Y. May 31, 2002) (citing Robbins, 528 U.S. at 285) (additional citations omitted),

adopted, 2002 WL 1808211 (S.D.N.Y. Aug. 6, 2002), aff'd, 368 F.3d 179 (2d Cir. 2004).  One

of the main functions of appellate counsel, however, is to "winnow[] out weaker arguments on

appeal."  Jones v. Barnes, 463 U.S. 745, 751 (1983).  As a result, counsel is not required to

present every nonfrivolous claim on behalf of a defendant appealing his or her conviction.

Robbins, 528 U.S. at 288 ("[A]ppellate counsel who files a merits brief need not (and should

not) raise every nonfrivolous claim, but rather may select from among them in order to

maximize the likelihood of success on appeal.") (citation omitted); accord Barnes, 463 U.S. at

754; Benn v. Stinson, 917 F. Supp. 202, 206 (S.D.N.Y. 1995).  As a consequence, "[i]n

attempting to demonstrate that appellate counsel's failure to raise a . . . claim constitutes

deficient performance, it is not sufficient for the habeas petitioner to show merely that counsel

omitted a nonfrivolous argument . . . ."  Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994)

(citing Barnes, 463 U.S. at 754).  Rather, a petitioner must show that appellate counsel "omitted

significant and obvious issues while pursuing issues that were clearly and significantly weaker."

Id.

III.   DISCUSSION

        Brown raises four grounds for relief: (1) the District Court inadequately considered his

mental deficiencies and diminished capacity in evaluating the sentencing factors listed in 18

U.S.C. § 3553(a), and that he was denied effective assistance of counsel when his attorney failed

to raise a specific Guidelines provision relevant to this claim, see Pet'r Mem. at 6–9; Pet'r Reply

at 5–7; (2) he was denied effective assistance of counsel on appeal because counsel failed to

challenge the sentencing enhancement for obstruction of justice pursuant to Guidelines § 3C1.1,

16

see Pet'r Mem. at 6, 9–10; Pet'r Reply at 7–9; (3) he was denied effective assistance of counsel because his attorney failed to seek a downward departure under the Guidelines based on consent to deportation, see Pet'r Mem. at 6, 10–12; Pet'r Reply at 9–10; and (4) he was denied effective assistance of counsel at sentencing and appeal with respect to whether the Guidelines offense level for second-degree, rather than first-degree, murder should apply to his sentence, see Pet'r Mem. at 6, 12–14; Pet'r Reply at 10–11.   We address each of these grounds for relief separately.

A.   Consideration of Mental Deficiencies and Diminished Capacity

Brown argues that "[t]he District Court failed to adequately consider [his] mental deficiencies and diminished capacity . . . in imposing [a] sentence under application of the 18 U.S.C. § 3553(a) factors."  Pet'r Mem. at 6.  Brown did not raise this issue on appeal, however. Accordingly, the claim is procedurally barred unless he can show cause and prejudice or actual innocence.  See Bousley, 523 U.S. at 622.  Brown makes no showing of any of these, however. Instead, he simply argues that his claim amounts to "a Due Process allegation and thus a Constitutional claim and is therefore not procedurally barred . . . ."  Pet'r Reply at 5.  But case law is clear that "a procedural default of even a constitutional issue will bar review under § 2255, unless the defendant can meet the 'cause and prejudice' test."  Campino v. United States, 968 F.2d 187, 190 (2d Cir. 1992).  Because Brown has offered neither a justification for failing to bring the claim on appeal nor evidence of actual innocence, this claim cannot be raised in this habeas petition.

Brown also argues that his counsel was ineffective by not "bringing this section of the guidelines and authority for downward variance to the attention of the court."  Pet'r Mem. at 9; accord Pet'r Reply at 7.  The Guidelines recognize a downward departure for diminished mental capacity where "(1) the defendant committed the offense while suffering from a significantly

17

reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense."  U.S.S.G. § 5K2.13.  "The defendant must prove both of these elements by a preponderance of the evidence."  United States v. Valdez, 426 F.3d 178, 184 (2d Cir. 2005).  "Significantly reduced mental capacity" is defined as a "significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrongful."  U.S.S.G. § 5K2.13 cmt. 1.

Here, Brown's counsel submitted the psychological evaluations of Dr. van Gorp and Dr. Paradis to the court to consider in sentencing, both of which found that Brown had "Borderline range" intellectual functioning.  See Van Gorp Report at 6; Paradis Report at 6.  He also submitted a social worker's report that suggested that others exploited Brown due to his limited intellectual functioning.  See Albarus-Lindo Report at 17–18.  Brown's counsel also submitted letters to the court from Brown's friends and family that indicated that Brown may have mental deficiencies.  See, e.g., Nicola Brown Letter.  In his sentencing memorandum, Brown's counsel specifically noted Brown's "extremely limited cognitive ability" and described Dr. van Gorp's and Dr. Paradis's findings.  Def. Sent. Mem. at 7.  Finally, during the sentencing hearing, counsel argued that Brown was "particularly vulnerable to do things that he otherwise would not have done" due to "being challenged intellectually."  (Sent. Tr. 6).  While counsel did not seek a downward departure under Guidelines § 5K2.13, he argued for a non-guideline sentence of 20 years imprisonment based in part on the fact that Brown "is someone who is unsophisticated and very easily led."  Def. Sent. Mem. at 12.

As a general rule, "counsel's strategic choices are not to be judged by hindsight."  United States v. Monzon, 359 F.3d 110, 120 (2d Cir. 2004) (citing Strickland, 466 U.S. at 689).  Here,

18

there may have been good reason not to press the departure inasmuch as it does not apply where "the facts and circumstances of the defendant's offense indicate a need to protect the public because the offense involved actual violence or a serious threat of violence." See U.S.S.G. § 5K2.13. Here, of course, there was "actual violence," rendering the departure inapplicable. In addition, counsel could reasonably have concluded that he could not prove that Brown's diminished mental capacity "contributed substantially to the commission of the offense." Id. As a result, Brown's attorney's "request for a non-guideline sentence was objectively reasonable under the circumstances because it effectively included a diminished capacity argument." United States v. Robertson, 2011 WL 5353071, at *3 (D. Vt. Oct. 4, 2011), adopted, 2011 WL 5507386 (D. Vt. Nov. 7, 2011). As was noted in Robertson, "when a sentencing judge is fully informed of a defendant's psychological condition and considered a lower sentence, an attorney's failure to specifically request . . . a downward departure for diminished capacity . . . is not ineffective assistance of counsel." Id. at *4.

Furthermore, Brown cannot meet the second prong of the Strickland test: that is, he has not demonstrated that there is a reasonable probability that the outcome would have been different had counsel advocated for the downward departure under Guidelines § 5K2.13. Because the departure does not apply where the crime involved "actual violence" and resulted in "a need to protect the public," it is unlikely that the court would have applied the downward departure under Guidelines § 5K2.13 had Brown's counsel raised the issue. See, e.g., United States v. Ramirez, 154 F. Supp. 2d 774, 775 (S.D.N.Y. 2001) (denying downward departure "since the offense involved actual violence such as murder and robbery"); United States v. Volpe, 78 F. Supp. 2d 76, 92 (E.D.N.Y. 1999) (denying downward departure where defendant convicted of, among other things, aggravated assault and aggravated sexual assault), aff'd, 224 F.3d 72 (2d Cir.

2000).

For these reasons, Brown's claim that the District Court inadequately considered his diminished capacity in rendering a sentence, or that his counsel was ineffective in failing to advocated for a downward departure under Guidelines § 5K2.13, should be denied.

B.     Ineffective Assistance on Appeal for Failing to Challenge Guidelines Enhancement for Obstruction of Justice

Brown argues that he was denied effective assistance of appellate counsel because his counsel did not challenge the enhancement for obstruction of justice.  Pet'r Mem. at 9–10; Pet'r Reply at 7–9.  The Guidelines call for a two-point increase in the offense level where "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and . . . the obstructive conduct related to . . . the defendant's offense of conviction . . . ."  U.S.S.G. § 3C1.1.  The enhancement applies to, among other things, conduct that involves "threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness or juror, directly or indirectly, or attempting to do so."  Id. cmt. 4(A).  "The facts necessary to support an obstruction-of-justice enhancement need be proven only by a preponderance of the evidence."  United States v. Khedr, 343 F.3d 96, 102 (2d Cir. 2003) (citation omitted).  However, the obstruction-of-justice enhancement requires that the defendant have the specific intent to obstruct justice.  See United States v. Case, 180 F.3d 464, 467 (2d Cir. 1999) ("§ 3C1.1 contains a clear mens rea requirement that limits its scope to those who willfully obstruct or attempt to obstruct the administration of justice.") (citation and internal quotation marks omitted); United States v. Hernandez, 83 F.3d 582, 585 (2d Cir. 1996) (requiring the "specific intent to obstruct justice"); United States v. Rivera, 971 F.2d 876, 894 (2d Cir. 1992)

20

(defendant must "consciously act[] with the <u>purpose</u> of obstructing justice") (emphasis in original) (citation and internal quotation marks omitted).  Where the defendant raises the issue of state of mind, the sentencing court must make a "specific finding of intent."  <u>United States v. Bradbury</u>, 189 F.3d 200, 204 (2d Cir. 1999) (citation and internal quotation marks omitted).  In determining whether the defendant acted with requisite specific intent, a district court may rely on circumstantial evidence and inferences drawn from all evidence.  <u>See</u> <u>United States v. Sisti</u>, 91 F.3d 305, 313 (2d Cir. 1996).[5]

At the sentencing hearing, the court inquired about the "alleged obstruction" resulting from Brown's purported threat against Mundle.  (Sent. Tr. 8).  Brown's counsel disputed the strength of the Government's evidence by stating "it was not clear about exactly what was said . . . ."  (<u>Id.</u>).  Additionally, counsel objected to the enhancement on the basis that Brown lacked intent.  (<u>Id.</u>) ("I believe that if [Brown] did say anything . . . he was just caught up in the moment and [his statement] had nothing to do with real threats . . . .").  The court ultimately concluded that the threat "occurred in very much the way it was testified to at trial . . . ."  (Sent. Tr. 14).  But the court made no explicit finding that Brown had the specific intent to obstruct justice by making the threat.  Brown argues that his counsel should have raised on appeal the

---

[5]  Brown incorrectly argues that in order for any statements to be construed as obstruction of justice, the Government must also prove that the statement was material: "that is[,] it must have had some impact on the investigation or prosecution of Brown."  Pet'r Reply at 7 (emphasis omitted) (citing <u>United States v. Zagari</u>, 111 F.3d 307, 328–29 (2d Cir.), <u>cert. denied</u>, 522 U.S. 983 (1997), <u>and</u> <u>cert denied</u>, 522 U.S. 983 (1997)).  Although the court in <u>Zagari</u> states that "[a]pplication of § 3C1.1 generally requires findings of willfulness and materiality," the court cites specifically to Application Notes 3(D), (F)–(H) (now 4(D), (F)–(H)) to § 3C1.1.  <u>Zagari</u>, 111 F.3d at 328.  Each of these Application Notes contains an explicit materiality element.  Application Note 4(A), by contrast, requires only that the defendant threaten a witness with the intent to obstruct justice, and thus has no requirement that the threat be "material."  <u>See</u>, <u>e.g.</u>, <u>United States v. Archer</u>, 671 F.3d 149, 167 (2d Cir. 2011) (requiring only "[a]n intent to deter cooperation with the government" in the case of threats against witnesses).

District Court's error of not making "independent findings that Brown willfully attempted to obstruct justice."  Pet'r Mem. at 9.

Brown has not shown that his appellate counsel's performance was inadequate.  Even if the issue had been raised and the appellate court remanded the case for further fact finding, counsel could reasonably have believed that such action would have been of little utility to Brown as it simply would have resulted in the court explicitly stating what was obvious: that in making his threat, Brown was acting with a specific intent to obstruct justice given that he made the threat prior to Mundle testifying at trial.  See Sisti, 91 F.3d at 313 (sentencing court may take into account circumstantial evidence in determining whether defendant acted with requisite intent to obstruct justice).  Thus, the challenge to the enhancement was not a "significant and obvious issue[]" to be raised on appeal.  Mayo, 13 F.3d at 553.

In any event, Brown was not prejudiced because there was no reasonable probability that there would have been a remand for further fact finding.  The Guidelines calculation is "the starting point and the initial benchmark" for federal sentences.  Gall v. United States, 552 U.S. 38, 49 (2007).  But where an error in calculating the sentencing range under the Guidelines is harmless, remand for resentencing is not required.  See United States v. Tropiano, 50 F.3d 157, 162 (2d Cir. 1995) ("[W]e will vacate a sentence and remand for resentencing because of a misapplication of the Guidelines only if we determine that the error was not harmless.").  An error in calculating the offense level under the Guidelines "that would not, by itself, have made any difference to the calculation of [the] Guidelines sentencing range" is harmless.  United States v. Hertular, 562 F.3d 433, 448 (2d Cir. 2009); see also United States v. Lennon, 372 F.3d 535, 541–42 (3d Cir. 2004) (an error under the Guidelines is harmless when, if corrected, the same sentencing range results).  Here, Brown's sentencing range under the Guidelines was unaltered by

the application of the enhancement.  For a defendant in Criminal History Category I, a conviction

for first-degree murder under 18 U.S.C. § 924(j)(1) carries an offense level of 43, U.S.S.G.

§ 2A1.1, which corresponds to a sentencing range of life imprisonment, id. Ch. 5, Pt. A.  With the

two-point enhancement for obstruction of justice, Brown's offense level was 45, which similarly

results in a sentencing range of life imprisonment.  Because the sentencing enhancement did not

affect Brown's sentencing range, the error was harmless.  See United States v. Broxmeyer, 699

F.3d 265, 288 (2d Cir. 2012) (any error enhancing an offense level over 43 "would necessarily be

harmless" because it does not affect the calculation of the sentencing range), reh'g denied, 703

F.3d 132 (2d Cir. 2013); Hertular, 562 F.3d at 448 (misapplication of enhancement harmless

because base offense level of "43 would also have yielded a recommended lifetime sentence").

Therefore, Brown was not prejudiced by his counsel's failure to appeal the application of the

obstruction of justice sentencing enhancement.

  C.  Failure to Seek a Downward Departure Based on Brown's Likely Deportation

  Brown argues that his trial counsel's failure to seek a downward departure for his likely

deportation upon completion of his sentence was constitutionally ineffective.  See Pet'r Mem. at

6, 10–12; Pet'r Reply at 9–10.  Guidelines § 5K2.0 is a catchall provision that permits a

downward departure if the court finds "that there exists an aggravating or mitigating

circumstance" pursuant to 18 U.S.C. § 3553(b)(1).  U.S.S.G. § 5K2.0(a)(1)(A).  Where a

defendant consents to deportation following completion of the imposed sentence, a downward

departure is appropriate under § 5K2.0 only where there is "a colorable, nonfrivolous defense to

deportation, such that the act of consenting to deportation carries with it unusual assistance to the

administration of justice."  United States v. Galvez-Falconi, 174 F.3d 255, 260 (2d Cir. 1999); see

also United States v. Sentamu, 212 F.3d 127, 137 (2d Cir. 2000) ("Without a proffer of some

23

colorable, nonfrivolous defense to deportation, [defendant's] consent to deportation following the completion of [the] term of imprisonment is not a permissible basis for departure.").

As a consequence of his conviction in this case, Brown is classified as an aggravated felon.  See 8 U.S.C. § 1101(a)(43)(A)–(B), (E)(ii) ("The term 'aggravated felony' [includes] . . . murder . . .; [the] illicit trafficking in a controlled substance (as defined in section 802 of Title 21), including a drug trafficking crime (as defined in section 924(c) of Title 18) . . . ; [and] an offense described in . . . section 922(g) . . . (5) . . . of Title 18 (relating to firearms offenses).").  As an aggravated felon, Brown is deportable.  See id. § 1227(a)(2)(A)(iii) ("Any alien who is convicted of an aggravated felony at any time after admission is deportable.").  Furthermore, because Brown has been convicted of an aggravated felony, the Attorney General may not cancel his removal.  See id. § 1229b(a)(3).  Indeed, Brown concedes that "it may not be contested on any legitimate basis that [he] is anything other than a deportable illegal alien."  Pet'r Mem. at 12.

Because Brown had no colorable, nonfrivolous defense to deportation, trial counsel obviously acted reasonably by not making the pointless request for a downward departure based on consent to deportation.  See Herrera-Gomez v. United States, 2009 WL 4279439, at *6 (S.D.N.Y. Dec. 1, 2009) (holding that trial counsel's performance was objectively reasonable when refusing to argue for downward departure based on consent to deportation in absence of nonfrivolous defense); United States v. Aquino-Ramirez, 2001 WL 210363, at *3 (S.D.N.Y. Mar. 2, 2001) (same).  Moreover, in the absence of a colorable, nonfrivolous defense, trial counsel's failure to raise the issue does not prejudice the defendant, as "[w]ithout such a showing, merely consenting to deportation is an insufficient basis for a district court to grant a departure under § 5K2.0."  Hernandez v. United States, 2003 WL 223467, at *4 (S.D.N.Y. Jan. 31, 2003)

24

(citations omitted).

Brown argues that his counsel should have sought a downward departure pursuant to a policy adopted by the United States Attorney for the Southern District of New York ("U.S. Attorney").  See Pet'r Mem. at 11.  Beginning in 1996, the U.S. Attorney enacted a policy that supported one-point "downward departures under § 5K2.0 of the Guidelines for deportable alien defendants who pleaded guilty and consented to deportation as part of their plea agreements." Hernandez v. United States, 280 F. Supp. 2d 118, 127 (S.D.N.Y. 2003).  However, in 1997, the Acting Assistant Attorney General for the Criminal Division of the Justice Department distributed a memorandum that cautioned against such departures in light of the "streamlin[ed] . . . removal process" in the wake of the Illegal Immigration Reform and Immigrant Responsibility Act.  See United States v. Montez-Gaviria, 163 F.3d 697, 704 (2d Cir. 1998).  In July 1998, in response to the Justice Department's memorandum, the U.S. Attorney discontinued offering downward departures for consent to deportation because the policy had been adopted "on a trial basis" and "stipulating to deportation itself provides a significant benefit to an alien defendant and . . . further incentives, such as a reduction in the defendant's criminal sentence, are not warranted."  Sentamu, 212 F.3d at 129 (alterations in original); see also Montez-Gaviria, 163 F.3d at 705.  As of the time of Brown's conviction and sentencing, the policy had not been reinstated in the Southern District of New York.  Gov't Mem. at 42.  Nor would it make a difference if such a policy in fact existed: Government approval is neither required for a downward departure based on consent to deportation nor does it displace the requirement that the defendant have a colorable, nonfrivolous defense to deportation.  See Galvez-Falconi, 174 F.3d at 260.  Because Brown had no defense to his deportation, his ineffective assistance claim on this point is meritless.

D.   Failure to Argue that Brown Should be Sentenced for Second-Degree Murder Rather than First-Degree Murder

Brown argues that his counsel was ineffective at sentencing and on appeal with respect to his arguments as to why Brown should have been sentenced using a Guidelines range for second-degree murder rather than first-degree murder.  See Pet'r Mem. at 12–14; Pet'r Reply at 10–11.

Under federal law, murder is defined as "the unlawful killing of a human being with malice aforethought."  18 U.S.C. § 1111(a).  First-degree murder is

> [e]very murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, child abuse, burglary, or robbery; or perpetrated as part of a pattern or practice of assault or torture against a child or children; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed . . . .

Id.  All murders not within the definition of first-degree murder are second-degree murder.  Id.  Under Guidelines § 2A1.1, a conviction for first-degree murder results in a base offense level of 43.  A conviction for second-degree murder carries a base offense level of 38 pursuant to Guidelines § 2A1.2.  Application Note 2(A) of Guidelines § 2A1.1 states that "[i]n the case of premeditated killing, life imprisonment is the appropriate sentence if a sentence of death is not imposed.  A downward departure would not be appropriate in such a case."  On the other hand, Application Note 2(B), which addresses sentencing for felony murders, instructs that "[i]f the defendant did not cause the death intentionally or knowingly, a downward departure may be warranted."

Brown's claim of ineffective assistance on this point is based on the premise that because the court sentenced Brown to something less than life imprisonment, the court must have applied

26

a downward departure pursuant to Application Note 2(B).  See Pet'r Mem. at 12–13; Pet'r Reply at 10–11.  Following from this premise, Brown argues that the court's determination that Application Note 2(B) governed meant that Brown should have been sentenced for second-degree murder under § 2A1.2.  Id.  Brown thus argues that his counsel was ineffective for not making this specific argument at sentencing and on appeal.

Brown's argument is rejected because the premise it depends on is itself faulty.  The fact that Brown was given a sentence below the Guidelines does not mean that Judge Rakoff found that Application Note 2(B) governed. First, Judge Rakoff never stated that he was applying a "departure" under the Guidelines.  See Booker v. Washington, 543 U.S. 220, 226 (2005) (application of the Guidelines is not mandatory).  Second, the application note does not even govern because it applies only to "felony murder."  Third, Judge Rakoff explicitly rejected counsel's argument (see Sent. Tr. 4) that "it would be more appropriate to apply second degree murder versus first degree murder" (Sent. Tr. 3).

Accordingly, given that counsel objected to the sentencing range calculation on the basis that second-degree murder rather than first-degree murder should apply, and given that Brown's argument on this point rests entirely on a faulty premise, there is no basis for finding ineffective assistance of counsel.  See Torres v. United States, 2010 WL 2900149, at *9 (S.D.N.Y. June 18, 2010) (prejudice not shown when "counsel articulated an argument similar to the one Petitioner now claims he omitted . . . [but] counsel's argument was more coherent"), adopted, 2010 WL 2925090 (S.D.N.Y. July 22, 2010).  Notably, counsel duly pressed his argument for the application of Application Note 2(B) on appeal, see Def. App. Br. at 12–24, although it was summarily rejected, see Brown, 374 F. App'x at 211.

27

IV.   CONCLUSION

For the foregoing reasons, the petitioner's motion to vacate his sentence under 28 U.S.C. § 2255 should be denied.

## PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days including weekends and holidays from service of this Report and Recommendation to serve and file any objections. See also Fed. R. Civ. P. 6(a), (b), (d). Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. Jed S. Rakoff, and to the undersigned, at 500 Pearl Street, New York, New York 10007. Any request for an extension of time to file objections must be directed to Judge Rakoff. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. See Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010).

Dated: April 5, 2013
      New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

28